Le Roy Walter, Claimant, *v.* State of New York, Defendant.
(Claim No. 27891.)
Mary Sanders, Claimant, *v.* State of New York, Defendant.
(Claim No. 27910.)

Court of Claims, October 22, 1946.

*W. Roger Pratt* and *Willard R. Pratt* for Le Roy Walter, claimant.

*W. Chase Young* and *Francis L. McElroy* for Mary Sanders, claimant.

*Nathaniel L. Goldstein, Attorney-General* (*Harold S. Coyne* and *William F. Fitzpatrick* of counsel), for defendant.

LOUNSBERRY, J. These claims arose out of a highway collision which occurred at the intersection of Thompson and South Bay Roads, near Syracuse, in the town of Cicero, Onondaga County, New York, on October 4, 1944, were tried concurrently and thus disposed of herein.

On the morning of October 4, 1944, claimant, Captain Le Roy Walter, age thirty-two, an army flight surgeon then attached to the Syracuse army air base, accompanied by one Lieutenant Davidson was driven in an army staff car to the Rome army air base by a civilian army employee, claimant Mary Sanders, a chauffeur at the Syracuse army air base, who had been assigned by the motor-pool dispatcher to make the trip. Completing their business at Rome early in the afternoon, Captain Walter and Lieutenant Davidson entered the rear seat of the staff car, which claimant Sanders was driving, for the return trip to Syra-

cuse. Captain Walter had been on duty since early morning, and soon fell asleep. Lieutenant Davidson, who was not seriously injured, was on foreign duty at the time of the trial and his account of the events leading up to the accident was not available. The court, therefore, must attempt to determine what actually occurred from the physical evidence presented and from the widely differing testimony of the drivers of the two colliding vehicles.

South Bay Road consists of two nine-foot concrete strips. Thompson Road is a macadam highway, varying in width, but is approximately seventeen feet wide. At the intersection, South Bay Road runs in a generally northeast and southwest direction, and Thompson Road in a generally north and south direction, so that it crosses South Bay Road at a northeast interior angle of forty-three degrees. Traffic on Thompson Road, crossing the intersection, is controlled by standard State highway stop signs, one being located on the easterly edge of Thompson Road about 50 feet south of the intersection. On South Bay Road, about 300 feet east of the intersection, there is also a standard State highway crossroads sign, warning westerly bound traffic of the approaching intersection. Both highways are straight and level for considerable distances from the intersection. There was no material obstruction to the view of either of the drivers approaching the intersection. From sixty to eighty feet east of the intersection, South Bay Road widens gradually on both sides, making an additional curving paved surface into Thompson Road, and to the east the ground outside the paved portions of South Bay Road is practically level with the highway.

The afternoon of the accident was clear and sunny, the road surface dry. The staff car, with claimant Sanders driving, traveled west on South Bay Road, approaching the intersection. On Thompson Road, traveling north into the intersection, was a dump truck owned by the Department of Public Works of the State of New York, and driven by one Fred Holtz, a State employee. The truck was loaded with four tons of warm macadam, known as " black-top ", for construction work being conducted on Route 31, further north. There were no other vehicles in the vicinity.

At a point near the center of the intersection, the right front of the staff car collided with the right side of the truck near the rear wheels. The impact broke the rear shackles of the truck, which continued forward a probable ten feet before its rear wheels and the entire rear assembly weighing 1,500 pounds

broke loose, jumped a fence into a field northwest of the intersection, and came to rest nearly eighty feet distant. The rear of the loaded truck body dropped to the pavement, and the truck dragged and skidded on towards the north up Thompson Road sideways, the rear of its chassis scraping intermittent gouge marks of from three quarters to an inch in depth in the macadam surface of the road, for a distance of forty-nine and one-half feet. The staff car, badly damaged, remained in South Bay Road near the center of the intersection. A skid-mark, forty-one feet long, led from its left rear wheel. The skid-mark commenced east of the intersection in the north lane of South Bay Road and angled southerly down across the center line of the highway, indicating a swerving of the staff car to the left. Another skid-mark, five and one-half feet long, led from the right rear wheel to the north indicating a pivoting of the rear of the staff car to the south as its front end was shoved north from the probable point of collision.

The testimony of claimant Sanders and of Holtz furnished conflicting accounts of the events leading up to the collision, and must therefore be considered in the light of the physical evidence produced. As these two drivers approached the intersection, it was the duty of both to drive carefully to avoid a collision, and in doing so to use reasonable care and mutual forbearance. (*Ward* v. *Clark,* 232 N. Y. 195, revg. 189 App. Div. 344; *Shirley* v. *Larkin Co.,* 239 N. Y. 94, revg. 208 App. Div. 833; *Shuman* v. *Hall,* 246 N. Y. 51, revg. 219 App. Div. 75; *Plantz* v. *Greiner,* 232 App. Div. 73.) The right-of-way privilege conferred by statute (Vehicle and Traffic Law, § 82, subd. 4) is a flexible rule, not a matter of law, and in its application implies the duty of reasonable care and mutual forbearance. (*Reynolds* v. *State of New York,* 174 Misc. 333, revd. 262 App. Div. 927.)

Claimant Sanders' statements as to her speed and operation of the staff car were consistent at both the trial and the preliminary hearing conducted by the Commissioner of Motor Vehicles. She testified that she approached the intersection at a speed of about forty to forty-five miles an hour, but was uncertain of the exact speed of the staff car as its speedometer was broken. She testified that she had traveled South Bay Road on numerous prior occasions, and knew of the intersection with Thompson Road. Upon observing the truck approaching the, intersection from her left, she stated she slackened speed, but continued into the intersection, assuming that the truck would stop and grant her vehicle the right of way. When she finally

perceived that the truck was not going to stop, she testified she applied her brakes and swerved to the left, though not far enough to avoid the collision.

Holtz's testimony at the preliminary hearing and at the trial, varied considerably. At the hearing, he testified he brought his truck to a halt " right at the stop-sign." At the trial, he testified he did not stop at the stop sign, but " about eighteen feet from South Bay Road." He also stated that, as he brought his truck to a stop, he looked both west and then east on South Bay Road, " for three or four hundred feet " but saw no vehicle approaching; that he then shifted into third gear and entered the intersection; that he again looked to the east when the front wheels of his truck were " at the south edge of the concrete " of South Bay Road, although actually the " concrete " of South Bay Road was obliterated by a layer of macadam at the intersection, and then saw the staff car approaching about " one hundred and fifty to two hundred feet away "; that he was traveling at " possibly six, seven, eight miles an hour " as he started across the intersection, but that when he did see the staff car, he continued to increase speed to " about ten " miles an hour, at the time of collision, in an effort to get out of the way; that, at the time of the collision, the rear wheels of his truck had just crossed the center of the intersection. Holtz further testified that the truck's brakes were in good condition, and that he could have stopped in " probably four or five feet " when he first saw the staff car. He did not attempt to stop, when the front wheels of his truck were at the south edge of South Bay Road, however, nor to turn his truck to the right or left, nor is there any evidence that he did anything to avoid the accident other than to continue to increase speed in an effort to beat the staff car across the intersection.

Claimant Sanders further testified that the truck, as she watched it approach the intersection, did not stop or slacken speed at all. The court is of the opinion that this observation is probably true, as the final position of the truck after the collision, and the distance which the heavily loaded truck chassis had dragged on north, after the rear wheels broke loose, indicates a greater momentum, and a consequent greater rate of speed of the truck through the intersection than that testified to by Holtz. If he had stopped, as he testified, it is difficult to visualize the loaded truck, in so short a space, attaining such an indicated momentum and speed. The State, apparently cognizant of this, argues that the loaded truck body was " impelled " to the north by the force of the impact with the

staff car; but the direction of the blow from the staff car was in the opposite direction, or towards the rear of the truck.

In addition to being under a legal duty to bring his truck " to a full stop at or close to the intersection " (Vehicle and Traffic Law, § 95-d), Holtz was under the corelative duty of maintaining a proper lookout for approaching traffic upon entering the intersection. His view to the east on South Bay Road was unobstructed; he, himself, admitted he " could have looked back a mile " in that direction; but that when he was stopped about eighteen feet from the intersection, he looked back only "three or four hundred feet", and saw nothing; and then, when he belatedly saw the staff car approaching 150 to 200 feet away, that he did not increase speed " until he got forty or fifty feet from me." Considering the physical nature of this intersection, with an unobstructed easterly view for the approaching truck driver from a considerable distance south of the intersection, and at an interior angle to his right that further increased his field of vision, and with South Bay Road, a former railroad bed, running straight and level for " about a mile " to his right, if Holtz had maintained a proper lookout at any time, being under an admitted ability to stop in " four or five feet", he could have avoided this accident by the simple act of using his brakes.

In any event, whether Holtz halted his truck for the stop sign, as he says, or proceeded across South Bay Road without stopping as testified to by claimant Sanders, we are of the opinion that Holtz was grossly negligent in observing the rules of the highway as provided by statute. He was bound to use such care to avoid an accident as an ordinarily prudent man would have used. Claimant Sanders was not required to foresee Holtz's blind and uncompromising adherence to an undeviating line. (*Ward* v. *Clark*, 232 N. Y. 195, *supra*.) " One has a right to assume that all drivers of automobiles will obey the law of the road, and he is not bound to anticipate that anyone is going to disobey it." (*Goebel* v. *Vaught*, 126 Ore. 332, 338.) " A statute designed for the protection of human life is not to be brushed aside as a form of words, its commands reduced to the level of cautions, and the duty to obey attenuated into an option to conform." (Judge CARDOZO in *Martin* v. *Herzog*, 228 N. Y. 164, 171–172.)

The court finds, therefore, that Holtz failed to stop the State truck at or close to the intersection, in compliance with the stop sign and the statute; that he failed to make a proper observation for approaching through traffic before entering the intersection; that he failed to yield the right of way to the staff car

approaching from his right; that he failed to have his truck under control and to stop or turn to avoid the collision upon finally observing the staff car; that he failed to drive his truck in a careful and prudent manner, and finally that the evidence and testimony presented support the finding of negligence on the part of Holtz, a State employee.

On the question of contributory negligence, first as to Captain Walter, the fact that he was asleep until the collision was undisputed; as a passenger, his failure to stay awake cannot be deemed to be contributory negligence, and no lack of care on the part of claimant Sanders, as driver of the vehicle in which he was riding, can be imputed to him. (*Nelson* v. *Nygren*, 259 N. Y. 71.)

As to claimant Sanders, she testified that she assumed the truck would stop, and under this assumption continued into the intersection at a reduced rate of speed. She had a right to make this assumption and to act accordingly. The rights of the approaching drivers in this case were not equal. The staff car, claimant Sanders driving, had the dominant position, as she knew because of her familiarity with the route. She saw the truck approaching, and had a right to assume that its driver likewise saw her vehicle and would come to a stop. Under these circumstances, it was not negligence for her to enter the intersection as she did. When she finally realized that the truck was not going to stop, she applied her brakes and swerved to the left in a vain attempt to avoid the collision. " One guilty of gross negligence may not complain that his victim did not use the highest degree of caution to avoid or to minimize the consequences of his own fault." (*Goschar* v. *Bauer*, 13 N. Y. S. 2d 328, 333.) The court is of the opinion that claimant Sanders acted in a careful and prudent manner to avoid the collision and operated her vehicle with reasonable care under the circumstances.

Claimant Sanders suffered injuries for which she is entitled to recover damages. No medical testimony as to her injuries was presented on her behalf, and the court must determine the extent and nature thereof mainly from her own statements. She sustained cuts and bruises, a broken collarbone, shock and a slight concussion. It was necessary, as a result of such injuries, that she be hospitalized for ten days, and she remained in bed at home for an additional two weeks after being released from the hospital. She testified that for four months after the accident, she was in a nervous condition, suffered recurrent headaches and was rendered unable to work. At the time of trial,

however, she appeared to be in good health, and stated that she was then employed in clerical work, although at less than she had received as an army chauffeur. There was no evidence that this wage differential was due to any loss of earning power caused by her injuries in this accident. None of the injuries she testified to was of a permanent nature, except for certain scars on her knees, and she admitted that otherwise she was fully recovered. There is no doubt that in addition to the foregoing she endured considerable pain and suffering from her original injuries, and she so testified.

The extent and nature of Captain Walter's injuries, as a result of this accident, is a more difficult matter. The expert testimony of the psychiatrists and physicians presented on his behalf and for the State, showed a wide variance of opinion as to the character, seriousness and permanency of his injuries. The extent and nature of his original injuries, and the various fractures he sustained, are undisputed. They were serious. He sustained a severe fracture of the right side of his forehead involving both the outer and inner tables of the skull and a comminuted fracture of the nasal bones with a resulting permanent deformity of the septum. He hemorrhaged from the nose and eyes immediately after the accident and was unconscious for several hours, both indicative of a serious injury or contusion and concussion of his skull. He was released from the hospital on December 13, 1944, and was again hospitalized for a short time in February, 1945, for " depression " and eventually reclassified as " limited service " by the army.

Prior to the accident, Captain Walter's mental and physical health was excellent. He possessed a superior intellect and was apparently highly qualified for his chosen work in surgery. The army had selected him as a flight surgeon because of his outstanding physical and mental qualifications. Following the accident, he testified to a loss of the sense of smell, to a permanent dilation of the pupil of his right eye with consequent eye-fatigue, to a recurring condition of dizziness and headache, to a tremor of his hands, and to a nervous, tense and emotionally depressed condition. Medical testimony for both the claimant and the State agreed that the severe shock which he sustained would naturally cause a period of nervousness and tension and that he could also naturally expect to have for a period recurrent headaches and dizziness. It was also agreed that his loss of sense of smell and the dilation of the pupil of his right eye with some consequent eye-fatigue was permanent and that the fracture of the nasal bones at the base of his nose and between his

eyes resulted in a permanent deformity and a consequent difficulty in breathing, which condition could only be cured by an operation on his nose. As to the length of the period during which claimant might continue to suffer dizziness, tension and depression, medical testimony could not agree. Claimant, himself, a physician, by his own testimony indicated his natural concern over his own condition and his lack of self-confidence in his future ability as a surgeon. It is possible that because he, himself, is a physician, his symptoms are magnified in his own mind, although the medical testimony presented on his behalf tended to prove that such condition, as a residual brain injury from the accident, would continue indefinitely, constituting a permanent injury. The medical testimony presented by the State tended to prove that claimant will gradually recover completely and be able to take up his career as a surgeon without any loss of ability caused by the accident. The trial was held about a year after the accident and it is not beyond reason, considering the seriousness of the original injuries, that certain effects of the accident would still be retained by the claimant and even the physicians testifying for the State were uncertain as to how long these effects would be retained, although hopeful that claimant would gradually recover. The court is of the opinion that claimant's surgical career is not at an end as far as major surgery is concerned and that as time progresses, and under proper treatment and advice, the claimant will gradually be restored, with the exception of the injuries listed as permanent, to his original healthy condition. As physical recovery progresses, the court believes that his depression and lack of self-confidence will also gradually be reduced and disappear. The length of this curative period is indeterminate, however, and must be borne in mind, together with the pain and suffering he endured, in considering proper compensation. He also sustained, by reason of this accident, special damages in the loss of additional pay to which he would have been entitled as a flight surgeon, at the rate of $100 per month, or a total of $1,200.

We, therefore, conclude that claimant, Le Roy Walter, is entitled to damages in the sum of $26,200, and that claimant, Mary Sanders, is entitled to damages in the sum of $3,000.