ANGELINE CANEPA, as Guardian ad litem of JOHN CANEPA, JR., an Infant, Claimant, v. STATE OF NEW YORK, Defendant. (Claim No. 29875.)

JOHN CANEPA, SR., Claimant, v. STATE OF NEW YORK, Defendant. (Claim No. 29876.)

JOSEPH I. GORIN, as Limited Administrator of the Estate of NELSON M. GORIN, Deceased, Claimant, v. STATE OF NEW YORK, Defendant. (Claim No. 30116.)

Court of Claims, December 2, 1952.

*Arthur VD. Chamberlain* and *Francis J. D'Amanda* for John Canepa, Sr., and another, claimants.

*Seymour Bernstein* and *Paul Muscarella* for Joseph I. Gorin, as limited administrator, claimant.

*Nathaniel L. Goldstein, Attorney-General* (*Frank M. Noonan* of counsel), for defendant.

GORMAN, J.  Sometime around 1:00 A.M. on April 22, 1949, four university students were proceeding along New York State Route 96, near the town of Manchester, Ontario County, New York, in a 1949 Ford automobile driven by Gerald Cramer.  The car which was being operated in an easterly direction was owned by the claimant, John Canepa, Sr., father of John Canepa, Jr., one of the passengers and a claimant herein.  Nelson Gorin and Robert Walther were also present in the car.  The young men had left Rochester, New York, in the late evening, with John Canepa, Jr. driving, preparatory to returning to Syracuse University.  The boys stopped at Victor, New York, for sandwiches and coffee, and, at this point, Gerald Cramer began to drive.  The car had proceeded about six to eight miles along the twenty-foot macadamized road when it approached an old bridge over the tracks of the Lehigh Valley Railroad.  As the highway approached the bridge from the west, it was straight and almost level for a distance of about four miles.  It then dipped and curved slightly to the south, or right, on a short tangent of 100 to 200 feet, the curve measuring about six degrees. The highway then curved to the left on a radius of about 200 feet, and turned through a total angle of approximately eighty degrees on a rising grade to the south end of the railroad overpass.  This rise in grade was about 4%.  Route 96 then proceeded across the narrow bridge at about level grade, and turned to the right through an angle of about ninety degrees, on a descending grade.

About 200 feet to the west of the bridge itself, the highway widened to about thirty feet for approximately 138 feet.  It then reduced in width for about fifty feet until it narrowed to twenty-two feet approximately twenty-five feet before it entered the bridge which was about twenty feet in width.  It was at about this point that the Canepa car went through the guardrail.  The shoulders of the highway were about four feet in width, widening somewhat at the outside of the curve and then reducing sharply to about zero at the bridge.

It is apparent that the situation was one fraught with dangerous potentialities if an unsuspecting motorist did not receive adequate warning thereof.  There was an ordinary reflectorized slow sign about 150 feet east of the beginning of the curve, and a similar sign about 230 feet west of the beginning of the curve. The claimants place a third sign, a reflectorized slow sign surmounted by a curved arrow, about 800 feet west of the beginning of the curve, while the sole State's witness contended that this was a reflectorized slow sign with a reverse curve

Scotchlite reflector sign and that it was located about 500 feet west of the beginning of the curve. His evidence is inconclusive and we are unconvinced as to the existence or location of such a sign. There were no signs designating a prescribed speed for the safe negotiation of the curve, and no signs giving any indication that the driver was approaching a narrow bridge.

Gerald Cramer was unfamiliar with Route 96, as was John Canepa, Jr., who usually travelled to Syracuse by Route 31, which was under construction at the time of the present accident. The highway was dry, visibility was good, and the Canepa car was traveling with its high-beam lights on just prior to the accident. John Canepa, Jr. and Robert Walther were dozing, and Gerald Cramer, not realizing that the highway curved until it was too late to negotiate the curve safely, ran into the guard-rail near the bridge, damaging the car, and causing the death of Nelson Gorin and serious injury to John Canepa, Jr., both of whom were thrown from the car.

The State of New York is under a positive duty to keep its highways in a reasonably safe condition for use of the traveling public. (*Doulin* v. *State of New York,* 277 N. Y. 558.) If it is not possible to eliminate from a heavily travelled highway a combination of dangerous elements such as sharp reverse curves, a narrow bridge and a change in elevation of a heretofore straight and level highway, the State should be diligent to see that these circumstances are made apparent to travelers on the highway. *Barna* v. *State of New York* (267 App. Div. 261, affd. 293 N. Y. 877); *Ziehm* v. *State of New York* (270 App. Div. 876), and *LeBoeuf* v. *State of New York* (169 Misc. 372, affd. 256 App. Div. 798, affd. 281 N. Y. 737) have firmly established that the State must post adequate warnings of conditions and situations which may endanger the safety of users of the highway. The signs erected must be sufficient to fulfill their intended purpose. (*Trimble* v. *State of New York,* 263 App. Div. 233; *Laitenberger* v. *State of New York,* 190 Misc. 633, affd. 273 App. Div. 942.) The State has been directly charged with liability for maintaining insufficient or misleading signs. (*Ziehm* v. *State of New York, supra; Garrette* v. *State of New York,* 197 Misc. 842.)

Under the circumstances of the present case, we feel that the State did not take adequate measures either to alleviate the perilous combination of elements which comprised this particular section of Route 96, or in the absence of immediate ability to remedy the situation, to provide reasonable, adequate and timely warning thereof. Here, the surrounding flat terrain

gave no indication of the artificial hazard, created by an old-style railroad bridge, which was to be unexpectedly encountered on a sharp rising curve in a previously straight and level highway. The tracks of the Lehigh Valley Railroad which ran on the left of the highway were not visible at night. The State had made little effort to reduce the hazards of this highway. It had made no tests to determine a speed safe for the negotiation of this curve although there was a long accident record in the vicinity of this curve and bridge. The signs which it had erected were not placed in positions recommended by the State Traffic Commission which states that a curve warning sign should be reflectorized and located 300 feet in advance of the P. C. of the curve, and they were not indicative of the conditions to be encountered, but were, at best, general in nature. Considering all of the factors, we conclude that they constituted a dangerous situation which the State should reasonably have anticipated, and of which it was undoubtedly aware as manifested by its plans to reconstruct this portion of Route 96.

We find that the driver, Gerald Cramer, was not guilty of negligence which caused or contributed to the accident. The legal speed on New York State highways is fifty miles an hour, unless otherwise posted. Ball bank tests conducted by the claimants' engineers showed that twenty to twenty-two miles an hour was the maximum safe speed to be used in negotiating this curve. It is evident that the two slow signs were of little value in warning the driver that he was approaching a sharp curve. They may well have been misleading under the circumstances. The third sign is, therefore, an important element in the case. Even if we accept the testimony of the State to the effect that this sign was a reverse curve sign, we do not feel that its position almost 800 feet in advance of the beginning of the curve was sufficient to give the driver of the Canepa car adequate warning that it was necessary for him to slow his car to approximately twenty miles an hour to negotiate a curve he was to meet such a distance away. Cramer had a lawful right to drive a car holding a learner's permit since he was accompanied by a licensed driver. Moreover, he had taken his driver's test and successfully passed it, his driver's license being dated the same day as the accident. We further feel that the position of the car, hanging through the low guardrail, and teetering on the brink of the cliff, is not indicative of great speed. Under all of the circumstances, we believe that adequate and proper warning would have resulted in a slower speed and in a quicker realization of the dangers ahead on the part of the driver of

the Canepa car; and we, therefore, hold that the failure of the State to provide proper warning was the proximate cause of this accident.

We further find that the passengers, John Canepa, Jr. and Nelson Gorin, were not guilty of any negligence which caused or contributed to this accident. In the case of Nelson Gorin, the burden of showing contributory negligence rested upon the State, and this burden was not met. Even if, and we do not so find, the driver, Gerald Cramer, had been guilty of negligence in the operation of the Canepa vehicle, we do not believe that such negligence would be imputable to the passengers in the car. Gorin, clearly had no responsibility for any possible negligence of Cramer, under the circumstances of the present case, and we think that any possible negligence would not be imputable to John Canepa, Jr. who was not the owner of the car and was not the agent of the owner (*Juliano* v. *State of New York,* 190 Misc. 180, affd. 273 App. Div. 936). He was asleep at the time of the accident (*Walter* v. *State of New York,* 187 Misc. 1034) and had no prior knowledge of any possible careless use of the vehicle. (See Restatement, Torts, § 495, comment e.) Under the driving conditions prevailing on the present day high-speed modern highway, we feel that in normal circumstances, only one person can be responsible for meeting unexpected emergency conditions and that such person must be the driver. (See *Jenks* v. *Veeder Contr. Co.,* 177 Misc. 240, affd. 264 App. Div. 979.) Any interference from a passenger at such a time is apt to contribute to, rather than decrease, the danger. (Restatement, Torts, § 495.)

John Canepa, Jr. was very seriously injured. He received a complete fracture of the humerus of the right arm, and injury to the radial nerve which resulted in paralysis of the right hand. On May 9, 1949, he underwent an open reduction of the bone of the right arm which was fixed with a metal plate. He was discharged from the hospital May 18, 1949, and remained in a body cast from his hips to his shoulders until June 13, 1949. Paralysis and loss of sensation of his right hand remained. He was readmitted to the hospital January 25, 1950, for exploration of the radial nerve which was discovered to be completely severed, and retracted, leaving a three-inch gap. On May 31, 1950, motion of his right elbow was limited thirty degrees from complete extension, and twenty-five degrees from complete flexion. On June 2, 1950, he underwent an operation, consisting of the transplanting of three arm muscles to restore some function to the hand. On March 3, 1952, his condition was such that

he lacked twenty degrees of complete extension of his elbow, and ten degrees of complete flexion; a permanent limitation of the pollex flexion of the wrist; instead of the dorsi flexing his wrist in normal position, it comes in toward the radial side; and he can extend his fingers and wrist to about a thirty-five degree angle. There has been considerable atrophy of the forearm and arm, and some atrophy of the muscles of the right shoulder.

Beginning shortly after the accident, John Canepa, Jr. began to experience leg cramps and back aches, especially when he exercised. This continued until about October of 1951, when he became completely paralyzed below the waist. He underwent an operation for a herniated disc in the twelfth dorsal region and was confined to the hospital from October 20, 1951, until November 29, 1951, and at home with a private nurse until December 25, 1951. He was obliged to use crutches and a cane, and had been using a cane until about three weeks prior to the trial. Young Canepa suffered excruciating pain from this condition which was a direct result of his accident, and has some impairment in the gait of his left leg. He has lost one year of college and been forced to abandon plans for the pursuit of a dental career. Claimant John Canepa, Jr. is entitled to an award against the State of New York in the amount of $30,000.

John Canepa, Sr., the owner of the car involved in the accident, and the father of John Canepa, Jr., was responsible for the medical care and treatment of his son who was a minor at the time of the accident and the subsequent accrual of medical expenses. He is entitled to an award against the State of New York in the amount of $8,868.48, which includes the damages to his car.

Nelson Gorin, at the time of his death, was eighteen years of age and had a life expectancy of 43.53 years. He left surviving him his father, Dr. Joseph I. Gorin, the claimant herein, who was fifty years of age at the time of the accident and had a life expectancy of 20.91 years, and who is totally disabled due to a severe heart condition; and his mother, Anna Gorin, who was forty-nine years old and had a life expectancy of 21.63 years at the time of the accident. Nelson was an intelligent, industrious and promising young man. He was a freshman at Syracuse University, desired to pursue a journalistic career, and enjoyed excellent health. He worked summers and after school during high school and had accumulated $497 which he withdrew from the bank to help cover his college tuition. The

estate of Nelson Gorin incurred funeral expenses in the amount of $542.30. For the wrongful death of Nelson Gorin, the claimant Joseph I. Gorin, as limited administrator of the goods, chattels and credits of Nelson M. Gorin, deceased, is entitled to an award of $23,000, less the sum of $8,000 received in settlement of claims by Joseph I. Gorin, as limited administrator, against Gerald Cramer and John Canepa, Sr. in Supreme Court, with interest thereon from April 22, 1949.

The foregoing constitutes the written and signed decision of the court. (Civ. Prac. Act, § 440.)