Richard S. Heller, J.
This claim arises out of a motor vehicle accident which took place on Route 11 between the village of Grouverneur and the village of Antwerp at about 1:30 a.m. on July 22, 1955 in which claimant’s intestate was killed.
On August 12, 1955, Marjorie N. Smith, the widow of Grebliardt F. Smith, was appointed administratrix of his estate and as such duly filed notice of intention to file a claim on October 13, 1955 and thereafter filed a claim herein on October 11, 1956. The claim has not been assigned or been submitted to any other court or tribunal for audit or determination but the claimant has received from the operator and owner of the automobile in which claimant’s intestate was riding as a passenger, the sum of $16,800 on the basis that such owner and operator were joint tort-feasors with the State.
This accident occurred on Route 11 about a mile north of the village of Antwerp at a point where a county road known as Oxbow Road intersects Route 11 on the westerly side thereof. For approximately four miles north of the intersection of Route 11 and Oxbow Road,. Route 11 is a 2-lane highway relatively straight in alignment having no curve in excess of 2 degrees. Proceeding southerly on Route 11 north of this intersection, there is a 2-degree curve to the right about 336 feet in length. This curve is on an ascending grade of up to 4.8% to the south. Thirty-five feet north of the southerly end of this 2-degree curve to the right and 420 feet south of the beginning of the ascending grade, there were two signs on the right hand side of the road mounted one above the other. Each sign was about 30 inches by 30 inches nonreflectorized and the upper sign indicated a curve to the left and the lower sign bore a legend “40 MPH ”. The ascending grade then changed to about a 5% grade and at a point about 450 feet south of the sign, the road starts an 8% curve to the left and at about the same point there is the beginning of a crest vertical curve joining 5% grades ascending and descending on each side of the crest. About 100 feet south of the beginning of the curves there was a reflectorized sign on the right hand side of the road about 6.4 feet from the edge thereof, bearing the word “ Slow ”.
About two thirds of the distance around this 8-degree curve and somewhat south of the point where the road begins to descend in a southerly direction, Oxbow Road joins Route 11 *158 on the westerly or right hand side proceeding south. Oxbow Road is a county road with a pavement about 17 feet wide but at its juncture with Route 11 it has been flared to the north and to the south so that the pavement of Oxbow Road lies immediately adjacent to the pavement of Route 11’s southbound lane for a distance of some 80 feet. This pavement is of the same texture and color as the pavement on Route 11, North of the pavement of Oxbow Road there is an open area of dirt and gravel which is used by automobiles turning off Route 11 onto Oxbow Road and north onto Route 11 from Oxbow Road. This whole area of dirt and gravel and macadam pavement has been blended in with Route 11 and from the top of the pavement banking on the southbound lane at the westerly edge of Route 11, this entire area slants generally to the west and toward the grade of Oxbow Road which is the reverse of the banking on Route 11 on the 8 degree left curve.
On March 9, 1955, the traffic engineer for district 7 of the Department of Public Works wrote a letter to the assistant superintendent for operations and maintenance of the Department of Public Works requesting a Traffic Commission order authorizing the erection of a set of ‘ ‘ W-160 Oversize Assembly signs on Route U. S. 11, S. H. 5427, Antwerp-County Line, Town of Antwerp, Jefferson County.” This letter related to this specific location and continued in part “ The W-160 Assemblies are necessary to warn motorists that they are approaching an 8 degree curve which is located on a vertical curve. This location has been the scene of many accidents of which speed was usually the contributory factor. Several years ago the curve was rebanked and a coarse mix added to the surface to decrease skidding and aid drivers to negotiate the curve. This improvement seemed to help but motorists still get in trouble when negotiating this curve. ’ ’
The report then lists some 25 accidents at the location in the years 1948 through 1954 and continues “ It is recommended by Sgt. W. S. Steckel, and myself, that authorization for erection of W-160 signs be granted due to the relatively high traffic count for District 7 and the high accident record at this location. It is also believed that the W-160 sign would decrease accidents due to the fact that it would emphasize the potential danger of a particular location on a route which generally has fairly decent grades and alignment and is conductive to high speeds.”
At about 1:30 a.m. on July 22, 1955, a clear, dry night, one Howard Mutchler was operating a 1955 Oldsmobile owned by one Richard Dodd in a southerly direction from the village of (xouverneur toward the village of Antwerp. Mr. Mutchler *159 lived in Middletown, New York, and he had been employed for some 11 years as a truck driver. He was a member of the New York National Guard and at the time of this accident he was stationed for Summer training at Camp Drum near Antwerp, New York. Corp. Mutchler and a Sgt. John Furman had left Camp Drum between 7:30 and 8 o ’clock that evening and went into the village of Gouverneur. In the village they met three other members of the National Guard from Orange County, the decedent Gebhardt Smith, one Edward Helt and one Robert Hardy. At about 1 o’clock these five men left Gouverneur in the car owned by Richard Dodd with Corp. Mutchler driving the automobile for the first time and following Route 11 over which he had never driven before. The decedent was seated in the front seat next to the driver and John Furman was also in the front seat at the extreme right. Edward Helt and Robert Hardy sat in the rear seat of the automobile.
The testimony of all of the occupants of the car is that they were traveling at a speed of 45 to 50 miles per hour and none of the occupants of the car including the driver, saw the sign showing a curve to the left and a 40 miles per hour speed located some 35 feet north of the southerly end of the 2-degree curve to the right and on an ascending grade of 4.8%. The driver did see the refleetorized ‘ ‘ Slow ’ ’ sign located about 100 feet south of the north end of the 8 degree curve to the left.
The driver failed to negotiate this curve and at some point north of the intersection of Oxbow Road and Route 11 his right hand wheels dropped off the pavement of Route 11 and the car skidded broadside through the gravel area north of the pavement of Oxbow Road, across the Oxbow Road pavement and struck some rocks located on the right hand side of Route 11 south of Oxbow Road and skidded from there across Route 11 ending up on the left hand or easterly side of Route 11. The car burned and was a total wreck. The driver was thrown out of the car as was John Furman who was found lying in the middle of the road about 50 feet away from the wrecked automobile and the decedent was found under the right front fender of the car. The decedent was apparently killed instantly.
The State seeks to avoid liability here by establishing that the highway as originally constructed and as rebanked and resurfaced in 1951 was in accordance with good engineering practice at those times. The State also seeks to assert that the sole proximate cause of the injury was the negligence of the driver. For this purpose the State sought to establish the drinking of beer by Corp. Mutchler prior to the accident and introduced in evidence the accident report signed by him indi *160 eating that the accident occurred because of his unfamiliarity with a motor vehicle equipped with power steering and power brakes. The State also presented testimony by State troopers who arrived on the scene at least 45 minutes after the accident concerning certain skid marks on the highway and an opinion as to speed derived from the existence of those skid marks.
All of this is unavailing to establish freedom from liability of the State. The State has a positive duty to keep highways in a reasonably safe condition for use by the public and where a dangerous condition exists the State must be diligent to see that the circumstances are made apparent to users of the highway. (Canepa v. State of New York, 203 Misc. 694, affd. 306 N. Y. 272.) The alignment of this highway and its relationship with Oxbow Road were such as to create a dangerous situation which cast upon the State a minimum burden of giving adequate warning of the existing conditions. There is no indication of any contributory negligence on the part of the decedent and the evidence clearly establishes that a proximate cause of the death of claimant’s intestate was the negligence of the State of New York in permitting a dangerous condition to exist without adequate warning thereof.
Gebhardt F. Smith left as his heirs at law and distributees, his widow, Marjorie N. Smith, and two children, Carol Ann Smith, seven years of age, and Bruce Gebhardt Smith, three years of age.
At the time of his death Gebhardt F. Smith was 35 years and 8 months of age with a life expectancy according to the American experience table of mortality of between 31.78 and 31.07 years. The claimant was 33 years of age with a life expectancy of 33.21 years. They were married on October 12, 1947 and lived happily together as husband and wife until his death. He had been employed as an attendant at the Middletown State Homeopathic Hospital from September 19, 1946 as an attendant. At the time of death his semi-monthly salary was $166.90 and during the year 1955 until his death he had earned a total of $2,195.23. His full earnings in the year 1954 at this place of employment had been $3,766.20 and in the prior year they had amounted to $3,581.52. In addition to his employment at the State hospital, he earned approximately $10 a week as a bartender. He also received some income as a corporal in the National Guard which his wife approximated as $6 per week per year. He also worked as an umpire in the Industrial League in Middletown, New York, receiving about $30 a week for 12 weeks during each summer.
*161 He enjoyed good health and was active in athletics, community and civic affairs. He was a political leader in his district, a member of a volunteer fire company, president of the City Basketball League for the City of Middletown and manager of a National Guard softball team.
His death was apparently instantaneous and there is no claim for conscious pain and suffering.
The claimant is entitled to the sum of $55,000 for all damages plus $343 funeral expenses, making a total of $55,343 but there must be subtracted therefrom the sum received from the joint tort-feasors with the State of $16,800 leaving a sum of $38,543 for which claimant is entitled to judgment with interest thereon from July 22, 1955 to February 12, 1956, and from October 11, 1956 to the date of entry of judgment.
The foregoing constitutes the written and signed decision of this court upon which judgment may be entered. (Civ. Prac. Act, § 440.)
Let judgment be entered accordingly.