Fred A. Young, P. J.
On June 13, 1953 and for a considerable period prior thereto the State of New York main *358 tained a section of highway in the vicinity of Bloomingburgh, New York designated as Route 17. This highway was a principal artery of traffic leading to the southern Catskill Mountains and was heavily travelled particularly on weekends during the Summer season.
As the highway entered the Village of Bloomingburgh from the east it narrowed to two lanes. There was also a traffic light located in the eastern end of the village at the intersection of a village street with Route 17. The combination of the narrowing of the highway and the traffic light tended to slow traffic on this heavily travelled thoroughfare. Several hundred yards east of the traffic light a bridge carried Route 17 over Shawangunk Kill. For some distance west of the bridge and for approximately 950 feet east of the center line of the bridge Route 17 was 40 feet wide and paved with macadam. A white line painted on the center of the highway divided the east- and westbound traffic and the northerly edge of the highway was marked by a white line 18 inches wide.
At the eastern terminus of the macadam the road became a 30-foot three-lane concrete highway. As it proceeded east from the bridge the road curved to the viewer’s right and ascended a hill. At a point approximately 750 feet from the center of the bridge a sign bearing the legend 30 M. P. H. surmounted by another sign indicating a curve to the left, and an intersecting road branching off to the right, faced western bound traffic. Further east at a point some distance from the 30 M. P. H. sign, another sign bearing the legend “ Junction N. Y. 17K R ” faced westbound traffic. A group of directional signs were also located west of the 30 M. P. H. sign at a point where Route 17K intersects Route 17.
The distances and the locations hereinabove delineated are based upon the approximate estimates of the witnesses. Neither of the parties introduced an accurate map of the area in evidence; and, although the State’s Resident Engineer as well as a safety engineer appeared as witnesses, neither was called upon to locate the traffic light, the bridge, the eastern terminus of the macadam pavement, the locations of the various signs, the radius or degree of curvature of the curve, or the degree of the descending grade of the highway as it approached the bridge, with precision and accuracy.
As westbound traffic approached the macadam portion of the highway, the road flared to the right giving the appearance of a slight curve in that direction. The macadam section of the highway had been resurfaced in 1951 and 1952. This work had been completed approximately one year prior to June 13, 1953.
*359 On the day in question the claimant, Herman J. Stern, accompanied by his wife, Roberta, and their child, Cheryl Ann Stern, left their residence in Brooklyn at approximately 6:30 a.m. The Sterns, traveling west on Route 17, approached the Village of Bloomingburgh at about 9:45 a.m. Mr. Stern was operating his 1950 Chrysler sedan. It was raining heavily at this time and had been raining quite heavily for some time prior thereto. The Stern vehicle entered upon the macadam portion of the road at a speed of approximately 40 miles per hour. Upon observing the 30-miles-per-hour sign, Mr. Stern took his foot off the accelerator and stepped lightly on the brake. At this time he was approximately 25 feet west beyond the aforesaid sign. The vehicle began to slide. He attempted to straighten the wheels and pumped his brakes lightly, attempting to reduce the speed of the vehicle.
As the Stern vehicle proceeded down the hill, it continued to slide. Stern continued to pump his brakes lightly now aware that the road was very slippery and a sudden hard application of the brakes might throw his vehicle completely out of control. There then came a time when he was approximately 150 to 200 feet from the bridge. His car skidded into the eastbound lane as a vehicle owned by one Seidman approached from the opposite direction at this juncture, to avoid hitting the Seidman car Stern applied his brakes hard. His vehicle continued in its skid and started to turn hitting the left side of the Seidman car with its left front side.
The Stern car continued its spin making a 180° turn then hitting the south abutment of the bridge a glancing blow and thereafter hitting the right front side of a third vehicle operated in the eastbound lane operated by one Von Rudenborg. The Stern vehicle finally came to rest heading east in the eastbound lane with its rear adjacent to the south side of the bridge.
Mrs. Stern and Cheryl Ann Stern were thrown from the vehicle before it finally came to rest, both the passengers and the driver sustained injuries as a result of the accident.
It has been universally held by the courts of this State that the State of New York owes a duty to the public to keep its highways in a reasonably safe condition for travel and that a duty rests upon the State to maintain warning signs on a State highway if circumstances presented reasonably demand. (Dowley v. State of New York, 186 Misc. 571.) Ordinarily a defendant is not liable for conditions due solely to the weather, but where the highway, because of some existing condition becomes more slippery than the usual highway when wet, and is rendered dangerous for the traveling public, the State may become liable *360 to those injured thereby. (Veit v. State of New York, 192 Misc. 205.)
The primary question to be determined herein is whether that portion of the highway in question actually became abnormally slippery when wet. There has been considerable testimony with respect thereto. Two witnesses, one a member of the State police and the other a former member of that organization, both very familiar with the area, investigated the claimants ’ accident as well as several other accidents occurring at the same location. These officers were on the scene immediately after the accident and testified that the road became slippery when wet. One of them stated that his own motorcycle had slipped in that area under similar conditions.
They testified that oil leaking from cars, backed up because of traffic congestion, was deposited on the pavement and when it started to rain the highway was slippery for a considerable period of time, until the oil film was washed away. And the highway was slippery at the time they investig'ated this accident.
One of the witnesses described the condition as very slippery when it rained. Their testimony was corroborated by the State’s Resident Engineer, who although appearing as a witness for the State, admitted that he stated to a newspaper reporter, investigating accidents in the area in question, that the road was a hazard when wet, but reiterated his contention that fast driving and a film of oil drippings from cars was the major problem.
The owner of a garage located adjacent to the westbound lane at the west end of the bridge and one of his employees who also lived across the highway from the garage, both disinterested witnesses, testified to the slippery condition of the road when wet; and, to their observations or knowledge, of numerous vehicles skidding on its surface under conditions similar to those existing when the Stern accident occurred. The employee, Le Fleur, stated that he, while driving a vehicle in the same location and under the same conditions, had had it skid.
Reports of six accidents occurring in the area in question within a year subsequent to the Stern accident were received in evidence. These reports came from the files of the State police and are quite brief. All six reports indicated that the road surface was wet at the time of the accident, four of the reports state that at least one vehicle involved in the accident skidded.
The State has requested us to find that there is no evidence that each of these four accidents occurred on pavement upon which there were oil drippings, oil stains, bleeding spots or greasy spots. In view of the testimony of the troopers to the *361 effect that oil was continually deposited on the pavement so that the highway in question became slippery when wet and remained so until the oil film was washed away, and Mr. Yogi’s corroboration of this condition, we have marked these requests refused. Proof of subsequent accidents in the same locality is admissible not for the purpose of showing notice, but for the purpose of establishing the existence of a dangerous condition. (Veit v. State of New York, 192 Misc. 205, supra.) The reports do not fall within the prohibition of Johnson v. Lutz (226 App. Div. 772, affd. 253 N. Y. 124). The wet road and the skid marks of the vehicle are physical facts which were within the knowledge of the reporting troopers and are not necessarily based on hearsay. However, we cannot assign very much weight to these reports since we are not informed of the speed at which the vehicles involved were traveling. Moreover we find that there is sufficient evidence in the record to sustain a finding that the section of highway in question was abnormally slippery without consideration of these accident reports.
Upon the trial there was considerable discussion with respect to the claim of Suligowski v. State of New York (14 Misc 2d 585). The accident report prepared by the State police in that matter was admitted in evidence, and the troopers who investigated that accident testified such accident occurred at approximately the same location, one week before the Stern accident. However, the Suligowski claim is distinguishable on several grounds. Suligowski was.killed so that we have no knowledge of exactly how the accident happened except presumptions based upon the surrounding circumstances. Nor do we know the speed of his vehicle. Furthermore, the claim was based primarily on the alleged negligence of the State in improperly constructing the curve; this court found, however, that the curve was properly constructed and also held that the claimant failed to establish that the highway was abnormally slippery at the time of the Suligowski accident. We do not regard this later finding as conclusive in the instant matter for the question whether the highway was abnormally slippery at a certain time, is a factual one, and the determination reached by the court in the Suligowski matter was based upon the evidence therein presented. On the other hand, we are bound by the evidence presented to us in the instant claim.
We have concluded that the claimants herein have established by a fair preponderance of the credible evidence that the macadam portion of the highway in question became more slippery than normal pavement when wet, and that such condition existed for a considerable period prior to June 13, 1953. *362 Therefore, the representatives of the State of New York knew or should have known of the condition before the aforesaid date.
We find that the State of New York was negligent in maintaining the highway in question in its dangerous condition and also in failing to warn the traveling public until the condition was corrected that the road was more slippery than normal when wet. (Canepa v. State of New York, 306 N. Y. 272; LeBoeuf v. State of New York 169 Misc. 372, affd. 256 App. Div. 798, affd. 281 N. Y. 737; Ziehm v. State of New York, 270 App. Div. 876; Veit v. State of New York 192 Misc. 205, supra; Smith v. State of New York, 12 Misc 2d 156, affd. 8 A D 2d 931.)
We now proceed to consider the question of Herman Stern’s freedom from contributory negligence; we note that the tires on his vehicle were new. He had some familiarity with the road, having passed over it several times in prior years. However, this was the first time he had driven the road in 1953 and had never driven it before while it was wet.
While he had no recollection of the several signs appearing along-the road in question, with the exception of the 30 M. P. H. sign, his failure to observe these signs, most of which were directional, has no bearing on the question of contributory negligence. At the time he observed the 30 M. P. H. sign the curve ahead was quite obvious.
The other signs were merely route markers or, as we have stated, directional signs with the exception of the curve sign surmounting the 30 M. P. H. sign.
There is no question with respect to the speed of the Stern vehicle. Both parties have requested us to find he was proceeding at 40 M. P. H. when he applied his brakes in an attempt to slow down to 30 miles per hour. The only other eye witness to the accident, Von Rudenborg, who was called as a witness by the State, testified that he could not say Stern was going over 30 M. P. H. when the said witness observed him.
Stern was not aware that the road was very slippery until he applied his brakes. He was properly cautious, however, in applying them lightly. At the time Stern passed the 30 M. P. H. sign he observed no vehicle ahead of him in the westbound lane east of the bridge. He could observe part of the westbound lane of the bridge from the 30-mile-per-hour sign.
Von Rudenborg, who originally stopped at the light some 300 feet or more west of the bridge and then proceeded east, testified he was just coming onto the bridge which was 60 to 70 feet long, when he observed Stern then approximately 200 to 250 feet away. At this time traffic in the westbound lane was *363 congested on the bridge. However, he does not testify to any traffic stopped east of the bridge.
When Stern was approximately 100 feet from the traffic on the bridge Von Budenborg observed him to skid across the highway into the path of Seidman, who was then approximately 150 feet ahead of Von Budenborg and 30 feet from Stern. Thereafter the vehicles collided as described hereinabove.
Von Budenborg stated that Stern put on his brakes when Stern was approximately 100 feet from the traffic on the bridge, and went into a skid. Of course, Von Budenborg had no means of actually knowing just when Stern applied his brakes, he merely assumed Stern applied his brakes when the vehicle skidded.
At the time Von Budenborg first observed the Stern vehicle, it was on the proper side of the double white line separating east- and westbound traffic, although the vehicle was in the left-hand, westbound lane.
On the other hand, Stern testified that his vehicle started to skid as soon as he applied the brake, that he pumped his brakes lightly attempting to slow down on the slippery pavement as he went down hill, and it was not until he started skidding into the eastbound lane that he hit his brakes hard. In other words, he was actually in an emergency at the time he applied his brakes hard.
The sudden hard application of his brakes by Stern was not contributory negligence since he was in an emergency at this time. (De Carlo v. Falco, 8 N Y 2d 791; Gardner v. State of New York, 206 Misc. 503.)
The State asks us to find that the claimant was passing another vehicle on a curve. This request is based on the Motor Vehicle report filed by Von Budenborg, wherein a box on the reverse side of the report indicating the claimant was passing on a curve is checked. Von Budenborg made no mention of this fact in his testimony, nor did he place any vehicles in the westbound lane east of the bridge and, as indicated, this witness testified that the Stern vehicle was on the proper side of the double white line separating east- and westbound traffic. In fact at the point of the accident there was room for two lanes of eastbound and two lanes of westbound traffic.
While it is true that Stern felt his vehicle started to skid when he was approximately 25 feet west of the 30 M. P. H. sign and the accident occurred approximately 500 feet further west, we cannot say that the claimant, Stern, was guilty of contributory negligence in failing to get his vehicle under *364 control. He has testified that when he first started to skid he pumped his brakes lightly as he descended the grade in order to avoid going out of control. So that he traversed this stretch attempting to slow his vehicle on the slippery pavement and still retain control of it. Upon consideration of all the facts presented, we find that the claimant, Herman J. Stern, has established his freedom from contributory negligence by a fair preponderance of the credible evidence.
Claimants, Cheryl A. Stern and Roberta Stern, are free from contributory negligence.
As a result of the accident, the claimants’ daughter, Cheryl A. Stern, age 7, sustained a linear fracture of the left wrist as well as contusions and abrasions. She was hospitalized for 15 days and left the hospital with her arm in an aluminum cast. The fracture healed with no difficulty and she has no permanent disability. However, there is faint scar marks under her chin and on each knee anteriorly.
Claimant, Herman Stern, sustained a fracture of the fourth right rib and a fracture of the sternum at the junction of the manubrium. He also sustained a severe sprain of the neck. He was hospitalized for 15 days. The fracture of the sternum healed well, and he has no permanent disability except some bony prominence in the chest.
When examined just prior to the trial, there were no objective findings with respect to permanency of the inquiry to his neck or chest. At the time of the accident, Herman Stern was 47 years of age, and was engaged in the wholesale plumbing business, employing three people. For a while after the accident he was unable to lift things and hired an extra man. However, we find no permanent injury other than that hereinabove noted.
Claimant, Roberta Stern, aged 37 at the time of the accident was and is the wife of claimant, Herman Stern. As a result of the accident she sustained the following injuries: lacerations of the scalp; cerebral concussion; fractures of the left 9th, 10th, 11th and 12th rib; fracture of the 1st and 2d transverse processes of the left lumbar vertebrae; fracture of the sacrum from the top of the sacrum extending into the joint to a point below the lower border of the sacro-iliac joint. Fracture of the right pubic bone, lacerations into the right ischiorectal fossa and the superficial fibers of the sphincter; separation of the sternoclavicular joint. Three operations were performed under general anesthetic to repair the lacerations in the rectal area. As a result of her injuries to the rectal area, Mrs. Stern sustained a relaxed sphincter, which is a permanent condition. Because of such condition she suffers periods of bowel *365 incontinence and such condition has increased in frequency up until the time of the trial. She has a hump in the area of the sternoclavicular joint, which is permanent and complains of pain in that area. As a result of her injuries, she was unable to engage in marital relations until 1960.
There is no question that Mrs. Stern sustained severe and painful injuries and we have adopted certain requests submitted by the claimant with respect thereto and we see no need to repeat them herein.
She is still subject to headaches and dizziness as a result of the accident, and while the examining doctor who appeared on behalf of the State claimed he could find nothing objective with respect to the permanency of certain of her injuries, nevertheless he conceded that her complaints were not inconsistent with the injuries she sustained.
We find that the negligence of the State of New York in maintaining a dangerous condition at the location in question, and in failing to warn the traveling public of such condition was the proximate cause of the accident to, and injuries sustained by the claimants, and they are entitled to an award of damages for such injuries against the State of New York in the amounts indicated as follows:
Under Claim No. 33227, Herman J. Stern, special damages, $470.39; for personal injuries, $7,500, for a total of $7,970.39.
Under Claim No. 33228, Herman J. Stern, individually, damages sustained to his vehicle, $1,300.
Under Claim No. 33229, Herman J. Stern, special damages, medical and hospital expenses incurred as a result of injuries to his daughter Cheryl Ann Stern, $268.25; loss of services for said daughter, $250, for a total of $518.25.
Under Claim No. 33230, Herman J. Stern, medical and hospital expenses incurred as a result of injuries to his wife, Eoberta, $1,799.24. For loss of services of said wife, $5,000, for a total of $6,799.24.
Under Claim No. 33231, Cheryl Ann Stern, infant by her guardian ad litem, Herman J. Stern, for personal injuries $1,500.
Under Claim No. 33232, Eoberta Stern, for personal injuries, $62,500.
Notices of intentions were filed by the claimants in the above-entitled matters on September 11, 1953. The claims were filed and served in behalf of the claimants in the above-entitled matters on June 10,1953.